1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    FELIX BAUM,                              Case No.  19-cv-01718-EMC

8                 Plaintiff,

9         v.

10   J-B WELD COMPANY, LLC,                   **ORDER GRANTING IN PART
                                             DEFENDANT'S MOTION FOR
11                Defendant.                  SUMMARY JUDGMENT**

                                             Docket No. 65

12

13                          I.      **INTRODUCTION**

14         Felix Baum ("Plaintiff") filed a class action lawsuit against J-B Weld Company, LLC

15   ("Defendant" or "J-B Weld").  Defendant manufactures a range of epoxies and other products,

16   which it represents as being "Made in the U.S.A."  Plaintiff brings claims under the Unfair

17   Competition Law and Consumers Legal Remedies Act, alleging that Defendant's "Made in the

18   U.S.A." representations are false and misleading because its products contain impermissible

19   amounts of foreign-sourced content.  Whether that is true turns, at least in part, on whether the

20   accused products' containers and delivery systems (*i.e.*, the products' caps, tubes, bottles, nozzles,

21   and syringes, some of which are foreign-made) should be considered part of the "merchandise" for

22   purposes of determining "Made in the U.S.A." eligibility.  Defendant has filed a Motion for

23   Summary Judgment.

24                          II.      **BACKGROUND**

25   A.    Factual Background

26         Plaintiff alleges that J-B Weld is "a leading manufacturer of cold weld products" that

27   makes a wide range of sealants, adhesives, and other products.  Second Amended Complaint

28   ("SAC") at 1, Docket No. 38.  At issue are representations that J-B Weld has made on its products

and labels stating that its products are "Made in U.S.A." *Id.* at 2–3. Plaintiff alleges that he

"routinely was exposed to, saw, and relied upon Defendant's 'Made in U.S.A.' representations by

reading the front and back of" various J-B Weld product labels. *Id.* at 18. Plaintiff notes that on

the front of "each and every" product package the phrase "Made in U.S.A." appears directly below

a picture of the American flag. *Id.* at 2–3. He contends that, in fact, J-B Weld products "contain

more than a 'de minimis, or negligible,' amount of foreign content" despite the fact that the

company "prominently represents that [its] Products are Made in U.S.A." *Id.* at 13. Plaintiff

states that had he "known the truth about Defendant's 'Made in U.S.A.' representations, he would

not have purchased [Defendant's] Products." *Id.* at 18. As a result, Plaintiff claims to have

"suffered injury in fact and lost money at the time of purchase." *Id.*

      The California statute that governs "Made in U.S.A." origin claims is Section 17533.7 of

the Business and Professions Code. It states:

> (a) It is unlawful for any person, firm, corporation, or association to
> sell or offer for sale in this state any merchandise on which
> merchandise or on its container there appears the words "Made in
> U.S.A.," "Made in America," "U.S.A.," or similar words if the
> merchandise or any article, unit, or part thereof, has been entirely or
> substantially made, manufactured, or produced outside of the United
> States.
>
> (b) This section shall not apply to merchandise made, manufactured,
> or produced in the United States that has one or more articles, units,
> or parts from outside of the United States, if all of the articles, units,
> or parts of the merchandise obtained from outside the United States
> constitute not more than 5 percent of the final wholesale value of the
> manufactured product.

Cal. Bus. & Prof. Code § 17533.7.

      Plaintiff has identified 24 of Defendant's products that he believes contain impermissible

levels of foreign content. SAC at 1–2. Those products are identified in the Second Amended

Complaint as follows (the products in bold are the products that have been purchased by Plaintiff

United States District Court
Northern District of California

United States District Court
Northern District of California

1    personally):

| Epoxies: (in similar plastic and/or aluminum tubes/pouches with resealable caps) | (1) **J-B Weld Twin Tube**[1]<br>(2) KwikWeld Twin Tube<br>(3) MarineWeld Twin Tube<br>(4) WoodWeld Twin Tube |
|---|---|
| Syringe Epoxies: (in similar plastic tubes with plastic resealable caps, plastic syringes/EZMixer) | (5) KwikWeld Syringe<br>(6) ClearWeld Syringe<br>(7) Plastic Bonder Syringe (tan)<br>(8) **PlasticWeld Syringe**<br>(9) MarineWeld Syringe<br>(10) Plastic Bonder Syringe (black)<br>(11) WoodWeld Syringe<br>(12) MinuteWeld Syringe |
| Silicone Sealants, Gasket Makers & Threadlockers: (in similar tubes/pouches with plastic resealable caps and nozzles) | (13) **Black Silicone**<br>(14) Blue Silicone<br>(15) Clear Silicone<br>(16) Ultimate Black Silicone<br>(17) Ultimate Grey Silicone<br>(18) Hi-Temp Red Silicone<br>(19) White Silicone<br>(20) Water Pump & Thermostat Housing<br>(21) Perma-Lock Blue Threadlocker<br>(22) Perma-Lock Penetrating Threadlocker<br>(23) Perma-Lock Red Threadlocker |
| Specialty Product: (with plastic bottle and a resealable cap) | (24) SuperWeld |

*Id.*  As noted above, Plaintiff's contention is that the products' various casings, containers, and delivery systems (*i.e.* their tubes, caps, bottles, nozzles, etc.) have either a foreign provenance or contain imported materials.  *Id.* at 2.  Because American consumers have a "preference for American-made goods" and a "willingness to pay more for domestically made products," Plaintiff believes that Defendant was able to charge more because of its "Made in U.S.A." message.  *Id.* at 16.  He contends that "all consumers of Defendant's Products – whether they relied on the 'Made in U.S.A.' representations or not – paid a premium for a U.S. origin benefit they did not receive."  *Id.* at 17.

The Complaint alleges two counts: Count I is a UCL claim, premised upon: violations of California Business & Professions Code § 17533.7 (Made in USA labeling), the FTC Act 15

3

U.S.C. §§ 45 and 45a, California Civil Code § 1770(a)(4) (misrepresenting a product's geographic origin), California Civil Code §§ 1572–73 (actual and constructive fraud), and California Civil Code §§ 1709 (willful deceit and deceit to defraud the public or a particular class). Count II is a CLRA claim, premised upon California Civil Code § 1770(a)(4) (misrepresenting a product's geographic origin). *See* SAC at 22–25.

B.    Procedural Background

Plaintiff filed this suit as a proposed class action on April 3, 2019. Class Action Complaint, Docket No. 1. He filed a First Amended Class Action Complaint on May 9, 2019. *See* Docket No. 19. Defendant subsequently filed a Motion to Dismiss the First Amended Class Action Complaint. *See* Docket No. 23. That motion challenged the adequacy of Plaintiff's pleadings under Rules 8 and 9(b) and sought dismissal of the complaint under Rule 12(b)(1) for lack of standing (because Plaintiff had purchased only four of the thirty-nine products identified in the complaint) and 12(b)(6) (contending that the law governing the use of "Made in U.S.A." labels does not concern packaging and/or containers in which products are sold). *Id.* The Court dismissed the First Amended Complaint with leave to amend. *See* Docket No. 34. The Minute Order stated: "Given the text of Cal. Bus. & Prof. Code § 17533.7, Plaintiff is directed to file an amended complaint detailing Plaintiff's allegations with greater specificity and explaining Plaintiff's theory of the case. Plaintiff must specially allege each product he contends exceeds the 5% limit and state whether that excess is based on the container/packaging being included as part of the product on which the over-5% allegation is based." *Id.*[1]

---

[1] As the exchange below shows, standing was also to be addressed by the amended complaint:

> **THE COURT:** All right. What is your response? If they were to amend to say that all the products that are being asserted here exceed the 5 percent, knowing that there is a question -- at some point we are going to have to construe what "product" is -- . . . would that be enough to get to the next stage?
>
> **MR. JONES (counsel for J-B Weld):** If they could amend the complaint to do that, Your Honor, and this Court were to find that product includes the packaging components -- the tube, the caps, etcetera -- then yes, that would get them -- that would probably get them standing; get them a stated claim for relief.

Transcript of August 22, 2019 Proceedings at 9, Docket No. 36.

United States District Court
Northern District of California

1    Plaintiff filed a Second Amended Complaint.  *See* Docket No. 38.  Defendant subsequently

2    filed a second Motion to Dismiss.  *See* Docket No. 43.  In that Motion to Dismiss, Defendant

3    challenged both Plaintiff's standing to assert claims regarding products he had not purchased, and

4    his standing to seek injunctive relief.  *Id.* at 13–15.  In addition, Defendant argued that Plaintiff

5    failed to state a claim because (1) Section 17533.7 does not require that packaging (as opposed to

6    the "merchandise") be made in the United States, (2) a failure to come within the statute's 5%

7    safe-harbor provision does not constitute a *per se* violation, and (3) that, assuming no *per se*

8    violation, Plaintiff had failed to adequately allege that J-B Weld's merchandise "has been entirely

9    or substantially made, manufactured, or produced outside of the United States."  *Id.* at 6–13.

10    The Court denied the Motion to Dismiss.  *See* Docket No. 55.  It concluded that Plaintiff

11    had standing to assert claims which he had not purchased, but which were "substantially similar"

12    to products that he had purchased, and that—pursuant to *Davidson v. Kimberly-Clark Corp.*, 889

13    F.3d 956 (9th Cir.), *cert. denied,* 139 S. Ct. 640 (2018)—he also had standing to seek injunctive

14    relief.  *Id.* at 9.  As to whether Plaintiff has adequately alleged a claim, the Court concluded:

15
16        [T]here is a likelihood that whether the bottles, tubes, and caps at
          issue here constitute "merchandise" or "containers" is not something
17        that can be determined at the 12(b)(6) stage; that determination
          involves the application of the law to the particular facts of the case.
          Here, the container and applicators of the [glues/adhesives/sealants]
18        arguably play a functional role in the delivery and effectiveness of
          the adhesives; whether that function is sufficient to treat the
19        containers and applications as part of the "merchandise" would
          appear to constitute a mixed question of law and fact.

20    *See* Docket No. 55 at 8.  In addition, the Court concluded that—assuming (but not deciding) that

21    having foreign content in excess of the 5% safe-harbor level does *not* constitute a *per se*

22    violation—Plaintiff had adequately alleged a violation of the statute.  *Id.* at 13–14.

23    A motion for class certification has not yet been filed.  The only motion pending before the

24    court is Defendant's Motion for Summary Judgment.  *See* Defendant's First Motion for Summary

25    Judgment ("MSJ"), Docket No. 65.  Through the Motion for Summary Judgment, "Defendant

26    seeks an order granting summary judgment in its favor and entering judgment for Defendant with

27    respect to all causes of action in Plaintiff's Second Amended Complaint as set forth herein."  *See*

28    Notice of Motion for Summary Judgment, Docket No. 65.  The parties do not engage with this

United States District Court
Northern District of California

point in detail, but Plaintiff's Opposition to Defendant's motion notes the following:

> J-B Weld asserts that "there is no liability in this action" if the Products are within the California "Made in U.S.A." safe harbor. MSJ, at 8. However, this argument ignores that Plaintiff bases his UCL claim on J-B Weld's violation of the CLRA, various sections of the California Civil Code, and the Federal Trade Commission Act, 15 U.S.C. §§ 45 and 45a – *in addition* to § 17533.7. *See, e.g.*, SAC ¶¶ 15, 24, 26, 40, 63, 72-74. J-B Weld does not address these other predicate violations, much less demonstrate that Plaintiff has failed to state a UCL unlawful claim based upon them or that they are somehow insufficient.

Opp. at 14 n.8 (emphasis in original). Because J-B Weld "seeks an order granting summary judgment in its favor and *entering judgment for Defendant with respect to all causes of action* in Plaintiff's Second Amended Complaint," Notice of Motion for Summary Judgment, it would appear that J-B Weld believes the predicate violations underpinning Plaintiff's UCL and CLRA claims rise and fall together with the claim under § 17533.7 (the focus of this motion) and therefore if J-B Weld can show that it prevails on the § 17533.7 predicate violation (or that the FTC order is dispositive), it will prevail on everything.

C.    The Federal Trade Commission Proceeding

While this case has been unfolding, J-B Weld has also been involved in a proceeding before the FTC that pertains to related, if not identical, issues. Sometime prior to November 2019, the National Advertising Division ("NAD") of the Better Business Bureau "determined that the storage and delivery systems for certain of J-B Weld's products did not comply with the Made in the U.S.A. standard."[2] *See* Declaration of Neil Jones ("Jones Decl.") ¶ 5, Docket No. 65-3. That determination was reviewed by the National Advertising Review Board ("NARB") (the appellate body for NAD) because J-B Weld was not willing to comply with the NAD's recommendation, and in late 2019, when NARB also made recommendations with which J-B Weld refused to

---

[2] As explained in an FTC Enforcement Policy Statement, the federal "Made in U.S.A." standard states that "[a] product that is all or virtually all made in the United States will ordinarily be one in which all significant parts and processing that go into the product are of U.S. origin" and clarifies that "[t]he word 'parts' is used in its general sense throughout this enforcement policy statement to refer to all physical inputs into a product, including but not limited to subassemblies, components, parts, or materials." *Enforcement Policy Statement on U.S. Origin Claims*, FED. TRADE COMM'N (Dec. 1997), 1997 WL 736265, at *3; *see also* "Made in USA" and Other U.S. Origin Claims, 62 Fed. Reg. 63.756 (Dec. 2, 1997).

United States District Court
Northern District of California

comply, the issue was referred to the FTC.  *See* Exh. A to Supplemental Declaration of Neil Jones ("Supp. Jones Decl.") at 1, Docket No. 67-1; *see also* Plaintiff's Opposition to Motion for Summary Judgment ("Opp.") at 11 n.5, Docket No. 79.  J-B Weld represents that "the NAD had referred the single issue of whether J-B Weld's storage and delivery systems for certain products met the Made in the U.S.A. standard." Jones Decl. ¶ 10.  It asserts that no one "questioned the compliance of J-B Weld's (adhesive) juice or GAS[3] with the Made in the U.S.A. standard."  *Id.* ¶ 11.

The parties appear to agree that all of the products at issue in this litigation were involved in the FTC action.  *See id.* ¶ 7; Opp. at 11–14.  In addition, J-B Weld represents that its attorney specifically "asked the FTC whether it needed any information regarding J-B Weld's delivery and storage systems such as its containers, tubes, or packaging and offered to provide that information." Jones Decl. ¶ 13.  However, "[t]he FTC attorney leading the inquiry responded to [that] question with the following: 'At this time, [the FTC] inquiry relates to J-B Weld's products and not packaging.  If [the FTC] need[s] additional information on product packaging, I will let you know." *Id.* ¶ 14.  J-B Weld indicates that "[t]he FTC never asked about, never discussed with J-B Weld, and never considered, the foreign content for J-B Weld's delivery and storage systems. [Instead, it] only inquired as to the foreign content of J-B Weld's products themselves (*i.e.*, the chemicals that comprise the adhesive products)."  *Id.* ¶¶ 15–16.

On March 19, 2020, the FTC issued a Closing Letter, concluding its investigation into J-B Weld's products.  *See* Exh. A to Supp. Jones Decl. ("Closing Letter"), Docket No. 67-1.[4]  In relevant part, the letter stated:

---

[3] The parties sometimes use the terms "juice" and "GAS" (meaning glues/adhesives/sealants) to distinguish the core adhesive products from the packaging or containers.

[4] Several aspects of the Closing Letter suggest that the focus of the FTC investigation was broader than the issue of how a product should be assessed for purposes of evaluating origin claims.  For example, the letter noted that "although J-B Weld makes many U.S.-origin epoxy and silicone adhesive products in the United States, the Company also sells cyanoacrylate and other adhesive products that either incorporate significant imported content, or are wholly imported."  Closing Letter at 1.  In addition, it observed that J-B Weld had already implemented "a remedial action plan" which "included: (1) updating packaging . . . ; (2) removing unqualified U.S.-origin claims from general company marketing materials, including the J-B Weld website, . . . ; and (3) requiring updates to third-party online marketing materials for affected product lines."  *Id.* at 2.

> In general, although not specifically covered in the Policy Statement, the FTC has not required manufacturers to account for the origin of incidental, discarded packaging when analyzing product origin, unless the marketer's claims expressly or impliedly convey that the packaging is of U.S. origin. In this case, in certain instances, J-B Weld made unqualified "Made in USA" claims on its packaging about its products. While the glue contained in that packaging was "all or virtually all" made in the United States, the packaging itself, which had no independent value to consumers and was typically discarded upon depletion, was not. In the absence of consumer perception evidence showing otherwise, FTC staff finds it is unlikely that reasonable consumers interpreted the unqualified U.S. origin claims on these adhesive products as covering the incidental, discarded packaging.

*Id.* The letter concluded by saying: "Based on J-B Weld's actions and other factors, the staff has decided not to pursue this investigation any further. This action should not be construed as a determination that there was no violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45." *Id.* at 3. Furthermore, the Commission reserved the right to take further action, if necessary. *Id.*

## III.    DISCUSSION

A.    Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.[5]

---

[5] Evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form. *See* Fed. R. Civ. P. 56(c)(2) (providing that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"). *See, e.g.*, *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) (stating that "[e]ven the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible

United States District Court
Northern District of California

1     Where a defendant moves for summary judgment based on a claim for which the plaintiff

2  bears the burden of proof, the defendant need only by pointing to the plaintiff's failure "to make a

3  showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

4  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Fontenot v. Upjohn Co.*, 780 F.2d

5  1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue,

6  either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must

7  establish beyond peradventure all of the essential elements of the claim or defense to warrant

8  judgment in his favor") (emphasis omitted).

9  B.     Analysis

10         1.     What Is the Relevant Standard Under California Business & Professions Code

11                § 17533.7?

12     As noted above, § 17533.7(a) provides:

13             (a) It is unlawful for any person, firm, corporation, or association to
               sell or offer for sale in this state any merchandise on which
14             merchandise or on its container there appears the words "Made in
               U.S.A.," "Made in America," "U.S.A.," or similar words if the
15             merchandise or any article, unit, or part thereof, has been entirely or
               substantially made, manufactured, or produced outside of the United
16             States.

17  As the Court observed at the Motion to Dismiss stage, neither party has been able to point to a

18  clearly established test of how and by what criteria "merchandise" and "containers" (as those two

19  terms appear in § 17533.7) should be defined and distinguished.  *See* Order Denying Defendant's

20  Motion to Dismiss ("SAC Order") at 11, Docket No. 55.  The Court has previously suggested that

21  what constitutes "merchandise" might be best conceptualized as a continuum.  *See id.* at 11 (citing

22  *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 215 (2000) (Scalia, J.) ("[A] classic glass

23  Coca–Cola bottle, for instance, may constitute packaging for those consumers who drink the Coke

24  and then discard the bottle, but may constitute the product itself for those consumers who are

25  bottle collectors, or part of the product itself for those consumers who buy Coke in the classic

26  glass bottle, rather than a can, because they think it more stylish to drink from the former.")).  In

27

28  form at trial'").

United States District Court
Northern District of California

so concluding, the Court invoked the metaphor of a can of paint, at one end of the continuum, noting that the container serves no purpose other than to hold the paint and therefore that the can looks very little like part of the "merchandise." *Id.* At the other end of the continuum, the Court considered a soap-dispensing dish brush, observing that, although such a brush "contains" soap used to wash dishes, it will probably be viewed as the product itself because it performs a key role in applying and making use of the soap. *Id.*

In light of the arguments presented by the parties on the motion to dismiss, the Court concluded the line delineating the two ends of the continuum is not well defined. *Id.* at 12. It further concluded that determining what to treat as part of the "merchandise" would appear to constitute a mixed question of law and fact and was therefore a question best left to the jury, unless only one inference as to the ultimate conclusion could reasonably be drawn. *See id.* (citing, *e.g.*, *S.E.C. v. Phan,* 500 F.3d 895, 908–909 (9th Cir. 2007) (recognizing that mixed questions of law and fact are typically left for the jury).

The pending motion for summary judgment requires the Court to again examine the definition of the term "merchandise." In this regard, it is significant that § 17533.7(a) uses the phrase "merchandise or . . . its container." J-B Weld points out, "[t]he plain language of the statute explicitly distinguishes between 'merchandise or any article, unit, or part thereof' and the merchandise's 'container' in stating where 'Made in U.S.A.' advertising is placed." MSJ at 14. The term "merchandise" is used in the disjunctive with "container" in subsection (a), and thus the two terms are distinct from each other. And, as J-B Weld points out, "in stating the items for which liability is imposed, only the 'merchandise or any article, unit, or part thereof' is recited. The statute limits the use of "Made in U.SA." origin claim to "merchandise," not "containers." Furthermore, to the extent that the liability inquiry includes "any article, unit, or part" of the merchandise, that clarification applies again to "merchandise," not containers.

There is scant case law addressing the proper interpretation of Section 17533.7. As the Court briefly mentioned in its prior order, at least one California Court of Appeal has examined the terms used in Section 17533.7. *See Benson v. Kwikset Corp.*, 152 Cal. App. 4th 1254, 1272–73 (2007), *as modified on denial of reh'g* (July 26, 2007) (ultimately concluding that "[s]crews

and pins are distinct components clearly necessary to the proper use or operation of a lockset because without them one could not install or operate the product"). In *Benson*, the court examined the phrase "any article, unit, or part" and concluded that "when merchandise consists of two or more physical elements or pieces, section 17533.7 also applies to *any* distinct component of merchandise that is necessary for its proper use or operation." 152 Cal. App. 4th at 1273. However, *Benson*'s examination of this statutory term does not shed light on how to distinguish between "merchandise" on the one hand, and "containers" on the other. Neither party has cited California case law on point.

Since the parties last tangled over the proper standard, the FTC issued its Closing Letter which may have some bearing on the issue at hand. Relying on that letter, Defendant urges the Court to treat the outcome of the FTC proceeding as dispositive and grant summary judgment in favor of J-B Weld "for that reason alone." *See* Supplemental Memorandum of Points and Authorities to First Motion for Summary Judgment ("Supp.") at 1, Docket No. 67. The company contends that the FTC has clarified that "manufacturers are not required to account for the origin of discardable packaging," and argues that the FTC has determined "that J-B Weld's storage and delivery systems . . . are not subject to the 'Made in the U.S.A.' advertising standard." *Id.* at 2. Essentially, Defendant's contention is that—in light of the fact that the parties previously agreed that "no court or agency charged with enforcing Made in U.S.A. laws had ever decided whether delivery and storage systems . . . should comply with those laws"—the FTC Closing Letter is now the *only* judicial or administrative decision directly on this issue, and it should therefore be controlling. *Id.* at 3.

In response, Plaintiff argues that the FTC Closing Letter "is not binding." Plaintiff's Opposition to Defendant's First Motion for Summary Judgment ("Opp.") at 11, Docket No. 79. The Ninth Circuit has concluded that "informal opinion letters [of FTC staff attorneys] do not constitute authoritative guidance." *Syed v. M-I, LLC*, 853 F.3d 492, 504 n.6 (9th Cir. 2017) (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.19 (2007) (describing an FTC staff letter as not constituting "authoritative guidance")). In *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Service*, 629 F.3d 1024 (9th Cir. 2010), the Ninth Circuit stated: "By contrast, '[i]nterpretations such as

those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.' 'Such views, ... even if not authoritative for purposes of *Chevron*, are entitled to so-called *Skidmore* deference insofar as they 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.''' 629 F.3d at 1034–35 (quoting *Vigil v. Leavitt*, 381 F.3d 826, 835 (9th Cir. 2004)).

The Court agrees with Plaintiff's assertion that the FTC Closing Letter does not constitute binding authority. It has no collateral estoppel effect and is not entitled to *Chevron* deference. Moreover, the FTC was applying the Federal Trade Commission Act and not the California Business & Professions Code § 17533.7. On the other hand, in the absence of any judicial or administrative guidance as to how to approach the question presented in this case, the Closing Letter presents a useful legal standard for resolving the instant controversy – one that is keyed to consumer perception. Specifically, the Closing Letter frames the question whether the challenged products include the container and delivery systems as whether "reasonable consumers interpreted the unqualified U.S. origin claims on these adhesive products as covering" the container/delivery parts in question. Closing Letter at 2. While the factual findings made in the letter (*e.g.* that "the packaging itself . . . had no independent value to consumers and was typically discarded upon depletion" or that no evidence suggests "reasonable consumers interpret[] the unqualified U.S. origin claims on these adhesive products as covering the incidental, discarded packaging," Closing Letter at 2) is not dispositive to this Court's analysis in the instant case (given the different evidence presented in the two proceedings and the different wording of the state and federal statutes), that legal standard offers a useful framework; both parties concede the state and federal statutes share the same objective and are substantially parallel.

For instance, Plaintiff previously argued that the federal standard and the California statute should be read synonymously. At the hearing on Defendant's Motion to Dismiss the First Amended Complaint in August 2019, Plaintiff's counsel represented the following to the Court:

> **MS. SYVERSON (counsel for Plaintiff):** Well, Your Honor, a couple points on that. First, kind of going back to the legislative history of this amendment that was made to the California statute,

United States District Court
Northern District of California

1    the purpose of the amendment in and of itself was to bring
     California into a -- a lower threshold. It was a – California was in a
2    position where it was higher than the federal standard, and it was
     creating complications for businesses that were having –

3    **THE COURT:** When you say "higher," you mean –

4    **MS. SYVERSON:** They had to -- to say "Made in the U.S.A." had
     to be essentially a hundred percent. Whereas, the FTC standard was
5    all or virtually all. And the basis behind the amendment and the bill
     to enact the amendment was to kind of bring those regulations more
6    in line so that you didn't have a position where companies were
     having to basically come up with two sets of labels depending on
7    where their products were going. If I may, the legislative history,
     actually it says: This bill would lower California's domestic content
8    threshold for labeling a product as made in the USA by making it
     lawful to sell merchandise with this label so long as all or virtually
9    all of the product was made in the United States. This bill would
     specify that the all or virtually all standard has the same meaning as
10   the enforcement policy statement on the U.S. origin claims issued by
     the FTC. **So it goes back to the idea that the underlying purpose**
11   **here was to make the statutes the same.**

12   Transcript of August 22, 2019 Proceedings, Docket No. 36 (emphasis added).

13        Whatever the substantive overlap is between the California and federal statute, adopting a

14   legal standard focused on a reasonable consumer's interpretation of product-origin claims and on

15   whether those claims would include a product's container and/or delivery parts (as the FTC

16   reasoned) is entirely consistent with the purpose underpinning the California statute. First, in a

17   case involving whether the plaintiffs in *Benson* had standing to assert their UCL claims, the

18   California Supreme Court spoke to the legislative history and underlying purpose of Section

19   17533.7:

20        In particular, to some consumers, the "Made in U.S.A." label
          matters. A range of motivations may fuel this preference, from the
21        desire to support domestic jobs, to beliefs about quality, to concerns
          about overseas environmental or labor conditions, to simple
22        patriotism. The Legislature has recognized the materiality of this
          representation by specifically outlawing deceptive and fraudulent
23        "Made in America" representations. (§ 17533.7; *see also* Civ.Code,
          § 1770, subd. (a)(4) [prohibiting deceptive representations of
24        geographic origin].) The object of section 17533.7 "is to protect
          *consumers* from being *misled* when they purchase products in the
25        *belief* that they are advancing the interests of the United States and
          its industries and workers. (Sen. Holmdahl, sponsor of [Sen. Bill
26        No. 1004 (1961 Reg. Sess.) ] [which became § 17533.7] . . . , letter
          to Governor Brown, May 23, 1961) ['There are many Americans
27        who feel that American-made articles are of higher quality, and who
          rely on the "Made in U.S.A." label'].)" (*Colgan v. Leatherman Tool*
28        *Group, Inc.* (2006) 135 Cal.App.4th 663, 689, 38 Cal.Rptr.3d 36.)

13

> The Legislature evidently recognized some companies were using or might be tempted to use inaccurate "Made in America" labeling, that *some consumers might be deceived by and rely on it*, and that consumers and competitors who honestly made their wares in the United States and marketed them as such were being or would be harmed.

*Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 329 (2011) (emphasis added).  At the hearing, the parties also implored the Court to consider the statute's legislative history as represented by a report from the California Assembly Committee on Privacy and Consumer Protection.  *See* Cal. Assemb. Priv. & Consumer Prot. Comm., Bill Analysis of S.B. 633 at 5–6 (July 2, 2015), Docket No. 79-12.  First, that report identifies its subject as "*Consumer protection*: 'Made in U.S.A.' label," *id.* at 1 (emphasis added), making clear that the focus of the statute is on protecting consumers.  Second, the report acknowledges that "Americans are willing to pay more for a 'Made in the USA' product," *id.* at 10, which indicates the importance of aligning liability with *consumer expectations*.  Accordingly, the Court finds the reasonable consumer expectation standard should apply in analyzing Section 17533.7.  It therefore concludes that the relevant inquiry is: would a reasonable consumer interpret the term "merchandise"—to which the restriction of § 17533.67 applies—as including the container and/or delivery parts in question?

> 2. Has Plaintiff Failed to Make a Showing Sufficient to Establish the Existence of an Element Essential to the Case?

J-B Weld argues that Mr. Baum has presented no evidence supporting the assertion that a reasonable consumer would expect the container/delivery systems (*i.e.* the tubes, caps, nozzles, syringes) to be part of the "merchandise" which must be made in the U.S.A. and that he has thus failed to establish a genuine dispute as to a material fact.  *Celotex*, 477 U.S. at 322.  Plaintiff presented no survey evidence or even a declaration addressing this precise point.

In response, Plaintiff points to the evidence he has presented showing the *value* that consumers place in the products' containers and delivery parts, and he asks the Court to infer that this attribution of value demonstrates that a reasonable consumer would interpret the company's origin claims as covering the products' containers and delivery parts.  For example, Plaintiff argues:



Opp. at 12 (citing, *e.g.*, Exhs. B, C to Opp., Docket Nos. 79-5, 79-5); *see also id.* (█████████████████████████████████████████); *id.* at 7 ("Defendant emphasizes to consumers on the front labeling the critical importance in terms of function and value of the Products' 'Resealable No Waste Cap,' by prominently featuring the cap in a 'call out' box on the front of the Product packages.").

However, whether consumers value the cap or the syringe which help contain and deliver the GAS does not shed light in whether consumers believe that those parts of the delivery system constitute "merchandise" as opposed to the "container." Consumers may value the container and even pay more for the entire product (as they might for, *e.g.*, bottled water in an elegantly designed bottle and cap) because of the aesthetics or functions of the container, but still understand the difference between the "merchandise" and its "container." Again, Plaintiff has presented no consumer surveys, declarations from consumers (or even from himself), studies of the issue, deposition testimony, industry reports, or any other evidence that would tend to support the inference he asks the Court to draw between value of the container and it being considered part of the "merchandise."

Accordingly, the Court **GRANTS** summary judgment in favor of Defendant on Count I (UCL) to the extent that Count I is premised upon a violation of California Business & Professions Code § 17533.7.

---



3.    The Scope of the Relief Granted

As evident from the above analysis, the Court's grant of summary judgment as to the California Business & Professions Code § 17533.7 is based on the specific statutory language of that section which draws an explicit distinction between "merchandise" and "container." The Complaint alleges other predicate bases for Count I (UCL), including the FTC Act 15 U.S.C. §§ 45 and 45a, California Civil Code § 1770(a)(4) (misrepresenting a product's geographic origin), California Civil Code §§ 1572–73 (actual and constructive fraud), and California Civil Code §§ 1709 (willful deceit and deceit to defraud the public or a particular class). Count II (CLRA) is premised upon California Civil Code § 1770(a)(4) (misrepresenting a product's geographic origin). *See* SAC at 22–25. The statutory language of these predicate bases does not contain the same precise language as § 17533.7, and thus the Court's ruling does not extend to these other aspects of Count I or to Count II.

Nor is the Court prepared to rule on the motion for summary judgment to the extent the motion seeks a ruling on § 45 and 45a of the FTC Act. First, as stated above, the FTC Closing Letter is not binding. Second, although the FTC Closing Letter concluded that no showing of a violation sufficient to pursue an investigation had been shown, it also explicitly noted that the letter "should not be construed as a determination that there is no violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45." Closing Letter at 3. Lastly, the evidence that is before the Court appears to differ from that which was before the FTC.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS in PART** summary judgment in favor of Defendant on Count I (UCL) to the extent that Count I is premised upon a violation of California Business & Professions Code § 17533.7. To the extent the motion seeks summary judgment on all the other claims, the motion is **DENIED in PART** without prejudice to a further motion as may be permitted by this Court.

///

///

///

16

1    The Court directs the Clerk of the Court to temporarily file the entirety of this order under

2    seal.  The parties are ordered to meet and confer to determine which parts, if any, of this order

3    should remain under seal.  The parties shall report back on the issue of sealing within a week of

4    the date of this order.

5    This order disposes of Docket No. 65.

6

7    **IT IS SO ORDERED**.

8

9    Dated: July 28, 2020

10

11    _____

12    EDWARD M. CHEN
      United States District Judge

United States District Court
Northern District of California